STONE & McCARRICK, Inc., v. DUGAN PIANO CO. et al.

(Circuit Court of Appeals, Fifth Circuit. February 8, 1915.)

No. 2665.

COPYRIGHTS ☞4—SUBJECT OF COPYRIGHT—ADVERTISEMENTS.

Where a so-called manual of instruction in a system of salesmanship consisted of a collection of forms of advertisements to be used by dealers in connection with special sales of pianos and piano-players, and, though they were intended to be used by all dealers licensed by the publisher to use them, they contained representations of fact concerning the sale and the success thereof, which could not possibly be true as to all dealers, and by their extravagant puffing and misrepresentation had a tendency to mislead and deceive the public, such forms were not copyrightable, and the use thereof was not an infringement of a copyright of the manual of instruction, since, if mere advertisements are ever copyrightable, the law should extend its protection to those only that speak the truth, and not to that class of matter the effect of which is to mislead and deceive the public, especially as one applying to a court of equity for relief must come with clean hands.

[Ed. Note.—For other cases, see Copyrights, Cent. Dig. §§ 2, 9, 10; Dec. Dig. ☞4.

Matter subject to copyright, see note to Cleland v. Thayer, 58 C. C. A. 273.]

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit by Stone & McCarrick, Incorporated, against the Dugan Piano Company and others. From a decree dismissing the bill (210 Fed. 399), complainant appeals. Affirmed.

The appellant filed its bill in the District Court against the appellees, Dugan Piano Company, the New Orleans Item, and others, to prevent the infringement of the copyright of a book containing forms of advertisements and other matter, interspersed with rather attractive illustrations. The bill prayed an injunction, damages, and an accounting. The questions presented for decision arise upon an order made by the trial court dismissing the bill, which, among other allegations, contains the following:

"That complainant was organized for the purpose, among other things, of carrying on, and since its organization has carried on, and is now carrying on,

the business of writing, making, editing, publishing, and selling, books relating to the sale of pianos and player-pianos. That complainant, its officers and. employés, have spent much time, effort, study, and money in devising writing up, editing, publishing, and selling books adapted for instruction in the sale of pianos and player-pianos, aforesaid, and especially intended to be used by its subscribers and its licensees for reprinting in the form of advertisements in newspapers, magazines, periodicals, and other literature.

"Complainant further avers that, for the purposes aforesaid, it has written, or caused to be written, and prepared, published, edited, and copyrighted, a book entitled 'Manual of Instruction in the Use of Stone & McCarrick (Incorporated) System of Salesmanship,' and that its officers, agents, and employés, have spent much thought, skill, time, effort and money in devising, writing, editing, publishing, introducing, and selling. the book aforesaid; and that the book aforesaid was especially intended to be used by its subscribers and its licensees for reprinting parts thereof in a series of articles intended for advertising purposes, and was printed in such form as to be specially adapted for use as 'copy' for advertisements in newspapers, magazines, periodicals, and other literature; and that the said book so prepared was proper subject-matter for protection under section 5, Class A, of the Copyright Act of March 4, 1909 (Act March 4, 1909, c. 320, 35 Stat. 1076 [U. S. Comp. St. 1913, § 9521])."

The Manual of Instruction, denominated a book by the appellant, and made an exhibit to the bill, consists of 25 sheets, of approximately the size of a sheet of an ordinary newspaper, 22 of which are devoted to advertising matter, and the three last to what are termed "Prospect and Premium Letters." These sheets are bound together, and in this form they are disposed of by the author. The lower left-hand corner of each of the 22 sheets contains brief directions as to the time of the publication of the advertisement and as to the space required. For example: On page 1 are the following words and figures, "Ad No. 1, Wednesday, 7 cols." Page 2, "Ad No. 2, Thursday, 7 cols." And so on through the entire series. This collection, or book, of advertisements, contains both letterpress and pictorial illustrations. The following excerpts are taken from the letterpress of the book:

First. On page 1 the advertisement begins as follows:

"The pianos for this co-operative sale were personally selected at the factory by Mr. ―――― and upon arrival are being tested and inspected by Prof.

"300 New Pianos Worth $350 Each to be Sold for $248.75 Each.

"With the opening of our store to-morrow morning, a new plan of selling pianos in ―――― will be inaugurated. And a gigantic sale will have begun. The sale will consist of three hundred new pianos. No more. No less. These instruments were contracted for and this sale planned and arranged months ago. (This will be told of fully in another advertisement.) The pianos have been arriving now direct from the factory at the rate of a car load a day. The store is packed."

Second. Page 2:

"300 persons will each save $101.25 (101 dollars and 25 cents) by obtaining their piano through this co-operative sale."

Third. Page 6:

"When you begin to pay you begin to own your piano and in event of death all unpaid payments are immediately canceled."

Fourth. Page 7:

"Don't get away from the principal fact that first of all you get a piano through this co-operative plan for 248 dollars and 75 cents which will ordinarily cost you 350 dollars."

Fifth. Page 10:

"Saving Millions by Co-operation. A saving of $30,375 through this one transaction in Pianos."

Sixth. Page 11:

"One-third of these $248.75 pianos have been sold. Two weeks ago to-day we announced this co-operative sale. To-day—one-third of these pianos (in round figures) have been sold. We told you then that co-operation was power. This has been fully. proved by the instantaneous success of this sale."

Seventh. Page 13:

"Once again we tell this whole piano story. This is a story of success—of unprecedented success. It's a story of planning—then of concentrating unlimited power on working out the plan until it's a story of such stupendous success that the telling is spontaneous. We could not help repeating it if we would, or would not if we could. It's inspiring. It runs off the pencil faster than we can write. The reason for it, is the plan itself. Here it is: Don't miss a single syllable."

Eighth. Page 15:

"You are missing the opportunity of your life if you don't get one of these pianos during this co-operative sale.

"The pianos for this co-operative sale were personally selected at the factory by Mr. ———— and upon arrival are being tested and inspected by Prof.

"We knew this sale would be a success. The manufacturers (Kohler & Campbell), who are co-operating with us in this sale, knew it would be a success. We knew our prices were right and that our proposition was right. But we were not expecting such overwhelming success. We expected a shower, but we did not expect a downpour. The plain facts are—we have taken orders for twice as many instruments as we had expected to sell up to this time. And this is told for but one purpose, and one purpose only, and that is—to advise those who have already told us they would buy later during the sale—do not put off too long."

Ninth. On page 16:

"All records of piano selling surpassed. The success of this co-operative sale has been almost electrifying.

"The success of this sale was foretold the day it opened. It started out a success—and has kept it up ever since. The store has been as busy as a department store, where thousands of things are sold instead of a few. Up to this writing we have sold and delivered just sixty-seven instruments more than the largest estimate put upon the probable sales for the given time—which means that the sale will close from a week to two weeks earlier than we had expected. Remember—when three hundred pianos and one hundred player-pianos have been sold—the sale ends. Not another one of these instruments will be sold at these prices, upon these terms, or upon this plan. So come now."

Tenth. Page 17:

"Eighty player-pianos have been sold. But twenty remain to be sold through this co-operative plan.

"Nothing can tell the story of the success of this sale so well as this. Eighty of the one hundred player-pianos intended for this sale have already been sold."

Eleventh. Page 18:

"We are so likely to forget. We are so likely to put off. We get in the habit of thinking that we have plenty of time for this or that.

"This great piano sale is now in mind—when we pencil these thoughts. We have in mind that it was even our own expectation, when this sale opened that it would continue at least three weeks longer.

"Now we know it cannot possibly run for two weeks longer.

"This sale has been electrifying. It has been huge, gigantic, stupendous in its success.

"Like a snowball rolling down hill, it has gathered size and strength as it progressed.

"Yesterday we could scarcely serve our customers. To-day the same thing —and to-morrow, being Saturday, and this reminder to quicken your coming, we no doubt will have the largest single day's orders to fill of any one day since this big movement was announced.

"Is it, therefore, too much to ask that you come in the forenoon, if you can find it convenient to do so?"

Twelfth. Page 19:

"Last week of this great piano sale—positively.

"Verily co-operation is power. We have seen and experienced its power. The success of this sale is the proof. For here we are announcing the close of the sale this week, when we had not expected to announce it for three weeks later.

"Do you know what this announcement means?

"It means that we have practically sold these three hundred pianos and one hundred player-pianos in five weeks.

"For to-day—although this is Monday—we are certain we shall not have enough instruments left to fill all orders throughout the entire week. That is, if customers pour in upon us this week as they did last week. And it is certain that they will.

"For when dozens of persons read the heading of this ad and realize that it is 'now or never,' they will swamp us with applications.

"We know of enough persons, who have told us they would take a piano or player-piano before the sale closed, to book orders for every instrument now remaining unsold."

Thirteenth. Page 20:

"Sale narrows down to hours.

"It is now only a question of hours, when the last of these three hundred pianos and one hundred player-pianos will have been sold. Perhaps by to-morrow evening. Certainly, by the close of business Thursday."

Fourteenth. Page 21:

"Don't delay any longer if you want one of these pianos.

"It's all over. By the time this ad reaches you the last piano originally apportioned to us for this great co-operative sale will have been sold. A few may remain—and possibly three or four of the player-pianos. But these will be snapped up in the morning. After that we will take orders until the close of business on Saturday.

"This is a concession to belated buyers.

"It was the original intention for us to sell three hundred pianos and one hundred player-pianos on this wonderful plan. But the sale simply ran away with us. Large as it was, gigantic as was its scope, its success was so spontaneous that we are practically sold out to-day. In all our estimates we had fully expected the sale to take two weeks longer.

"So we say that 'booking orders' for later delivery is a concession to belated buyers. We, ourselves, know a number of persons who fully intended taking advantage of the sale, and who, for one reason or another have been prevented from doing so. This still gives them the opportunity."

Fifteenth. Page 22:

"Time's up. Saturday the sale ends.

"Sales may come and sales may go—but we doubt if any piano sale has ever been the success of this. Pianos are things you do not buy every day. You buy one in your lifetime; maybe two. Pianos represent a considerable investment. You can furnish a whole house very comfortably for the price of a single piano. So, when we tell you that there were days during this sale when we could not wait on our customers, you can then appreciate the stupendous 'go' to this sale. * * *

"The sale is not closing without every one having a fair opportunity to take advantage of it. If we had restricted the sale strictly to the number originally arranged for, the sale would now be a matter of history."

The appellees in the court below moved to dismiss the bill on the following grounds:

"(1) Because advertisements are not copyrightable and hence advertisement copy is not copyrightable.

"(2) Because the copyright of a text-book or Manual of Instruction in a useful art, science, or system does not confer upon the author or the proprietor of the text-book, even though copyrightable, a right of property in the art, science, or system explained in the text-book or Manual of Instruction, and hence complainant has not and cannot have an exclusive right to make, sell, print, or use advertisements written in accordance with the forms set forth in such book, and complainant has not and cannot have the right to limit the use thereof to purchasers of said Manual of Instruction or its licensees.

"(3) Because the description of an art, science, or system in a book, although said book may be entitled to the benefit of copyright, lays no foundation for an exclusive claim to the art, science, or system, as explained and exemplified in said book."

The motion to dismiss having been sustained, the appellant prosecutes an appeal from the decree of dismissal.

The opinion of Judge Foster, sustaining the motion to dismiss, is reported in 210 Fed. 399.

Ernest Wilkinson, of Washington, D. C., and Jas. Wilkinson, of New Orleans, La., for appellant.

Frank E. Rainold and Robt. H. Marr, both of New Orleans, La., for appellees.

Before PARDEE and WALKER, Circuit Judges, and MAXEY, District Judge.

MAXEY, District Judge (after stating the facts as above). 1. It may be conceded that the "Manual of Instruction" is a book within the meaning of the law of copyright.

2. Since the motion to dismiss the bill, interposed under the new equity rules, admits, as did demurrers under the former system, the allegations of fact well pleaded, it may be further conceded, in view of the positive allegations of the bill, that the appellees have infringed the copyright of the appellant.

3. But the further question remains: Is the manual of instruction a proper subject of copyright? In other words, is it copyrightable under the law and entitled to the protection of a court of equity? In this connection, it may be admitted ex gratia argumenti, without being decided, that some form of advertisements, such as characteristic advertisements, come within the protection of the law. But said Judge Jenkins, speaking for the Circuit Court of Appeals in Mott Iron Works v. Clow, 82 Fed. at page 321, 27 C. C. A. at page 255:

"So far as the decisions of the Supreme Court have gone, we think they hold to the proposition that mere advertisements, whether by letterpress or by pictures, are not within the protection of the copyright laws."

The question recurs: Is the manual of instruction, the particular book, or collection of advertisements—and it can be nothing else— of which the appellant is the author, subject to copyright? If in any case mere advertisements are copyrightable, the law should extend its protection to those only that speak the truth, and certainly not to that class of advertising matter the effect of which is to mislead and deceive the public. "The deceit of the public," said Judge Shipman in Celluloid Manufacturing Company v. Read, 47 Fed. at page 715, "and the consequent injury to it, are as much to be regarded by a court of equity as an injury to a plaintiff's business." See Wright v. Tallis, 50 Eng. Com. Law, 893–906; Hop. Trade-Marks, p. 370. It is a familiar maxim of equity that one who applies to a court of equity for relief should come in with clean hands, and, it may be added, he should show a clean bill of health to entitle him to its protection. The principle is clearly stated by Mr. Justice Field, as the organ of the court, in Manhattan Medicine Co. v. Wood, 108 U. S. at pages 224, 225, 2 Sup. Ct. at pages 440, 441, 27 L. Ed. 706, in a trade-mark case, and no reason is perceived why it is not equally applicable to copyright. The justice first quoted from an opinion of the Lord Chancellor of England, as follows:

"When the owner of the trade-mark applies for an injunction to restrain the defendant from injuring his property by making false representations to the

public, it is essential that the plaintiff should not in his trade-mark, or in the business connected with it, be himself guilty of any false or misleading representations; for, if the plaintiff makes any material false statement in connection with the property he seeks to protect, he loses, and very justly, his right to claim the assistance of a court of equity."

And again:

"Where a symbol or label, claimed as a trade-mark, is so constructed or worded as to make or contain a distinct assertion which is false, I think no property can be claimed in it, or, in other words, the right to the exclusive use of it cannot be maintained."

Proceeding, he employed the following language:

"When the case reached the House of Lords, the correctness of this doctrine was recognized by Lord Cranworth, who said that of the justice of the principle no one could doubt; that it is founded in honesty and good sense, and rests on authority as well as on principle, although the decision of the House was placed on another ground. The soundness of the doctrine declared by the Lord Chancellor has been recognized in numerous cases. Indeed, it is but an application of the common maxim that he who seeks equity must present himself in court with clean hands. If his case discloses fraud or deception or misrepresentation on his part, relief there will be denied."

See, also, Krauss v. Peebles' Sons Co. (C. C.) 58 Fed. at pages 594, 595.

And it may be added that, in the public interest, state punitive legislation has been deemed necessary to prohibit the publication of advertisements which "contain any assertion, representation or statement of fact which is untrue, deceptive or misleading." See Acts of La. 1914, pp. 279, 280.

The bill of the appellant alleges that the book "was printed in such form as to be specially adapted for use as "copy" for advertisements in newspapers, magazines, periodicals, and other literature." And counsel for the appellant, in their brief, insist that:

"The book does not teach piano dealers how to advertise their wares, but prepares the advertisements for the dealers, relieving them of the time, trouble, expense," etc.

It thus appears obvious that the advertisements are made to order, and nothing remains to be done by the dealer but to publish them in a newspaper or periodical according to the directions contained in the lower left-hand corner of each advertising sheet. These advertisements are to be used by all licensees, or dealers in pianos and player-pianos who may have acquired the right from appellant to use them, and it is apparent that the representations of fact embodied in the letterpress, excerpts from which are set out in the statement of the case, cannot be true as to all dealers. One dealer may sell 50 instruments and another 250 in a given time, yet in the advertising sheets of the appellant all are made to sell the same number of instruments within the same period of time. It is only necessary to glance at the matter of the advertisements, in that and in other respects, to satisfy the mind that their tendency, by the extravagant puffing of the wares of the dealer and misrepresentation of sales, is to mislead and deceive the public. However honest the intention of the author may have been in the preparation of its manual, it nevertheless remains true that the effect of its work is such as we have stated. Ex-

travaganzas may be indulged by a writer for the purpose of illustration and to accomplish the end in view, as exemplified by Don Quixote and others of a similar nature, and as thus employed they carry conviction to the reader and lend charm and interest to the story. But advertisements by dealers of their wares, in order to insure the protection of the law, should reflect the truth and avoid representations which mislead and deceive the people. If their tendency be misleading and deceptive, they will find the doors of a court of equity barred against their admission.

After a painstaking investigation of the present case, we have reached the conclusion that the particular advertising forms of the appellant, although covered by the copyright of the manual of instruction, are (1) not copyrightable, and (2) they are not entitled to the protection of a court of equity.

The decree of the District Court is therefore affirmed.