**QAD. INC., a California corporation, and Karl Lopker and Pam Lopker, individuals, Plaintiffs,**

**v.**

**ALN ASSOCIATES, INC., an Indiana corporation, and Sally Allen, Mike Allen and Ronald Whiteford, individuals, Defendants.**

No. 88 C 2246.

United States District Court, N.D. Illinois, E.D.

July 3, 1991.

As Amended July 17, 1991.

Ernie L. Brooks, Kevin J. Heinl and Thomas A. Lewry, Southfield, Mich., for plaintiffs.

Robert E. Wagner, Alan L. Barry, Michael D. Lake, Joseph A. Fuchs, Wallenstein Wagner & Hattis, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This action has been brought by qad. inc., Karl Lopker and Pam Lopker (collectively for convenience "qad"[1]) against ALN Associates, Inc., Sally Allen, Mike Allen and Ronald Whiteford (collectively for convenience "ALN") for various breaches of contract, copyright infringement, misappropriation of trade secrets, unfair competition (under both federal and state law) and making false representations to qad.[2] ALN has in turn launched its own claims against qad. All the claims stem from a basic dispute as to competing computer software distributed by the parties.

Only one of qad's claims is now at issue: its contention that ALN's software MFG + (also referred to as "MFG/PLUS") infringes on qad's copyright in a software program called MFG/PRO. Count III of qad's First Amended Complaint (the "Complaint"[3]) asserts:

> 20. ... The MFG/PRO computer programs embody and reflect imaginative and original forms of expression which distinguish them from software offered by other companies and which have helped make MFG/PRO computer programs successful.
>
> 21. The design, structure, sequence, organization and graphic interfaces of the MFG/PRO computer programs embody and reflect forms of expression original to qad.

qad further alleges (¶ 27) that ALN:

> continuously and willfully infringed qad's copyrights in MFG/PRO Software by copying the Software and marketing it as ALN's software ...

and that (¶ 29):

> Substantial portions of the computer software programs marketed by ALN as

---

1. Both this and the "ALN" label used to denote defendants collectively will be treated as calling for singular verbs and pronouns, simply because the plural usage (though technically correct) would sound more awkward.

2. This Court dismissed qad's trade secret claim against ALN on May 3, 1990 and imposed attorneys' fees and expenses against qad under Fed. R.Civ.P. ("Rule") 11 on June 18, 1990 (1990 WL 93362, 1990 U.S.Dist. LEXIS 7458 (N.D.Ill.)). On July 6, 1990 this Court, per Rule 11, further awarded against qad the cost of attorneys' fees incurred by ALN in the preparation of its earlier summary judgment motion that was withdrawn due to qad's amending of its original pleading, which was itself in violation of Rule 11 (1990 WL 106540, 1990 U.S.Dist. LEXIS 8350 (N.D.Ill.)). Most recently, still another opinion (757 F.Supp. 901 (N.D.Ill.1991)) granted ALN's motion for summary judgment on qad's claim that ALN had intentionally disrupted the business relations between qad and Hewlett–Packard and between qad and its licensees.

3. Further citations to the Complaint will take the form "¶ —."

ALN software are the same as and/or substantially similar to the qad MFG/PRO Software in their elements, code, design, structure, sequence, organization and graphic interfaces.

ALN now moves under Rule 56[4] for summary judgment as to its affirmative defense to Count III, claiming that qad misused its copyright of MFG/PRO and that it should therefore be prevented from obtaining relief against ALN for copyright infringement.[5] For the reasons stated in this memorandum opinion and order, ALN's motion is granted.

*Facts*

qad, which is incorporated and has its principal place of business in California, has as its principals Karl and Pam Lopker (also California citizens). ALN is an Indiana corporation with its principal place of business in Indiana, and it also does business within the Northern District of Illinois. Sally and Mike Allen are officers of ALN and are also Indiana citizens. Another Indiana citizen, Ronald Whiteford, is a principal of ALN.

MFG/PRO is a software program owned and distributed by qad to supersede another software program originally authored by Hewlett–Packard Corporation ("Hewlett–

Packard") and designated MFG/250 and FIN/250 ("HP250 software"). Both HP250 and MFG/PRO software perform manufacturing and accounting functions, although MFG/PRO performs other functions as well. HP250 was written in HP–Basic and runs only on Hewlett–Packard small business computers. Its manufacturing component was created in 1978 and the accounting component in 1981.

qad developed MFG/PRO (which it completed in 1986[6]) in the PROGRESS® language to run on MSDOS, UNIX and XENIX operating systems. Before it created MFG/PRO, qad had been a distributor of HP250 software since about 1980. And before writing MFG/PRO, some personnel at qad had access to the source code of HP250.

When marketing MFG/PRO in 1986, qad represented that MFG/PRO was an "updated" version of its software that ran on Hewlett–Packard small business computers.[7] qad copied much of the selection, order, arrangement and definitions of fields from HP250 to MFG/PRO.[8] Indeed, a qad notebook entry dated November 10, 1985 contained Pam Lopker's handwritten instruction to "copy HP250" (D.Ex. G, ¶ X.B.4).[9] That entry also contains a list of

---

**4.** Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). This District Court's General Rule ("GR") 12(m) and 12(n) requires factual statements in support of and in opposition to Rule 56 motions, and both sides have tendered such statements (respectively cited "D. 12(m)—" and "P. 12(n)—"). In addition to the materials developed for the current motion, both ALN and this Court have referred to the transcript of the original preliminary injunction hearing in this case (cited "Tr. —").

**5.** Even though ALN's motion is not a full-scope Rule 56 motion (see *Teamsters Local 282 Pension Trust Fund v. Angelos,* 649 F.Supp. 1242, 1252–53 (N.D.Ill.1986)), this Court has entertained it because it proves dispositive as to an entire claim of qad's.

**6.** When asked about when MFG/PRO was released, Pam Lopker testified (Tr. 53):

The first actual installation of the product was somewhere in I think spring of '86 that we were actually released some modules of MFG/PRO.

**7.** qad claims that representation was "puffing" (P. 12(n) ¶ 25). Even if it were an exaggeration of the truth, though, such a representation still supports ALN's proof that MFG/PRO and HP250 are alike in many ways.

**8.** qad denies that it copied those items from HP250, but it does not deny that the specific similarities identified by ALN exist. Instead qad now asserts that the apparent similarities are due to the common use of those terms in the manufacturing business (P.Mem. 17). qad's argument is discussed further below.

**9.** Pam Lopker now states (Pam Lopker Decl. 5) that her instruction reflects a transfer of data from an existing HP250 database to a new MFG/PRO database. That contradicts her earlier testimony that MFG/PRO was not released

files from MFG/PRO and the corresponding files from HP250 (*id.*). MFG/PRO and HP250 employ strikingly similar techniques to log the development, modifications and changes. Both MFG/PRO and HP250 share program naming conventions such as those that begin with "ar," "ap", "gl", "mf" (D.Ex. G, ¶ XI.C) and "cm" (Suslick Supp.Decl. ¶ 14). Nearly 75% of the manufacturing functions of the HP250 system appear in the MFG/PRO system. MFG/PRO and HP250 use substantially similar reorder strategies and identical average usage formulas of stockroom parts. They also use similar documentation styles.

qad's United States Copyright Registration TX 2–257–814 ("'814 Registration"), later corrected as TXu 399–204 ("'204 Registration"), covers MFG/PRO Version 1.2.[10] Neither filing discloses that MFG/PRO was based upon or incorporated any portion of HP250 software. Although it is clear that MFG/PRO is a more advanced program than HP250, it is also unmistakable that it is a work derivative from HP250.[11]

Between April 6 and May 3, 1989 this Court conducted a hearing (the "Hearing") on qad's motion to restrain ALN's use of MFG/PRO, or at least those portions of MFG + that were alleged to have been derived from MFG/PRO. That resulted in a Preliminary Injunction Order (the "Order") of July 17, 1989 (Order at 1):

(1) restraining ALN Associates, Inc. ("ALN"), Sally Allen and Mike Allen from violating any of qad's exclusive rights in its copyrighted MFG/PRO computer software, as specified in 17 U.S.C. § 106, by selling, copying, preparing a derivative work, distributing, publicly performing or displaying the qad copyrighted MFG/PRO computer software, the ALN software program known as MFG/PLUS (sometimes referred to as SLICK, Manufacturing +, etc.) or any other software program, documentation or related materials based on or derived form qad's copyrighted MFG/PRO software (17 U.S.C. § 101 and § 106); and

(2) ordering delivery to qad's counsel of all copies of qad's MFG/PRO software and manuals in defendants' possession with the exception of one copy to be retained in the custody of defendants' counsel.

Those restrictions were based on testimony by former employees of ALN and by an expert, Richard Rubenstein ("Rubenstein"), who testified that ALN must have directly copied certain portions of MFG/PRO (Order at 2). Rubenstein's testimony was critical to qad's case, for it showed that many field and program names as well as certain instructions were common to MFG/PRO and MFG +.

Now ALN has proved that many of the same names and other aspects of MFG/PRO are found in HP250, the program that

---

until 1986 (Tr. 53)—after the annotations were made. qad cannot use the unsupported declaration of Lopker to avoid summary judgment (see *Skagen v. Sears, Roebuck & Co.*, 910 F.2d 1498, 1500 (7th Cir.1990)):

> When a motion is made for summary judgment in a case, an adverse party may not rest upon mere allegations or denials of the adverse party's pleadings but the adverse party's response must set forth specific facts showing that there is a genuine issue for trial.

**10.** Even though two separate filings were made with the Copyright Office, they cover the same version of MFG/PRO. This opinion has therefore chosen to refer to qad's "copyright"—a singular noun. No confusion should be caused by qad's practice of referring to "copyrights" because of the two filings.

**11.** Lopker Decl. ¶ 15 denies copying from HP250, stating instead that "the HP250 software

was an inspiration for MFG/PRO." But the only other explanation qad offers for the striking similarities between the two programs and for the other evidence that points to copying is its new assertion that the common elements in the two programs are generic to such programs. As the discussion below explains, that explanation contradicts all of qad's earlier testimony at the Hearing. Rather than attempting directly to rebut the clear evidence of copying, qad now seeks to stress the differences between MFG/PRO and HP250. For example, it has submitted an 11 minute tape (P.Ex. 1–B) showing the lack of similarity between the screens and functions of two programs, MFG/PRO and HP250. But nothing in that tape or in any of the other evidence contradicts the evidence offered by ALN that substantial portions of the two programs are similar or identical.

qad copied. Both qad's copying of HP250 into MFG/PRO and its use of that material—over which it had no copyright—to gain an injunction against ALN are central to the resolution of this motion.

### Copyright Law

■ Article I, Section 8, clause 8 of the United States Constitution gives Congress authority:

> To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

Those two closely related privileges of copyright and patent have somewhat parallel histories (see *Lasercomb America, Inc. v. Reynolds*, 911 F.2d 970, 974–75 (4th Cir. 1990)). Although the intellectual property at issue in this case is that of copyright, many of the principles used in patent cases apply here with equal force. That is especially true given the nature of computer software—as explained in Note, *Clarifying the Copyright Misuse Defense: The Role of Antitrust Standards and First Amendment Values*, 104 Harv.L.Rev. 1289, 1299 (1991) (footnotes and citations omitted):

> Computer software, however, differs from other works of authorship in ways that make it more like a patented invention. What users value most in a computer program is rarely the expression contained in its coded instructions; rather, it is the utility of the program in accomplishing some purpose.

There is no question that Congress has extended copyright protection to computer programs.[12] *Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1234 (3d Cir.1986) (citation omitted) states:

> Title 17 U.S.C. § 102(a)(1) extends copyright protection to "literary works," and

12. 17 U.S.C. § 101 includes this definition:
 A "computer program" is a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result.

13. ALN's Answer and Amended Counterclaim to First Amended Complaint ("Answer") ¶ 56 states:

computer programs are classified as literary works for the purposes of copyright.

Such protection can be extended only to the author's "expression of ideas" in the software (*Whelan Associates, id.;* 17 U.S.C. § 102(b)), though the scope of expression may include many facets of the work. As *Whelan Associates,* 797 F.2d at 1248 explains:

> [C]opyright protection of computer programs may extend beyond the programs' literal code to their structure, sequence, and organization....

■ But even those general areas may not be protected unless they are in fact the original expressions of the author. Copyright protection must be perceived in terms of the public purpose behind the granting of the copyright. And the only purpose of granting a copyright to an author of computer software—as it is for the progenitors of other written material and patented inventions—is "to promote Progress" in that field. As *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 558, 105 S.Ct. 2218, 2229, 85 L.Ed.2d 588 (1985) puts it:

> In our haste to disseminate news, it should not be forgotten that the Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.

Just as freedom of expression is the fount of copyright protection, so a copyright may not be asserted improperly to inhibit other persons' freedom of expression.

### Limits of Copyright

ALN has advanced the affirmative defense [13] of copyright misuse against qad's Count III. D.Mem. 3 asserts:

> Plaintiffs are barred from any relief under Count III for unclean hands as Plaintiffs have misused their copyrights by misrepresenting the scope and content of the alleged copyrights in Reg. Nos. TX 2–257–814 and TX 2–257–813.

Answer ¶ 55 alleges qad's unclean hands based on its conduct before the Copyright Office. An-

Despite the significant incorporation of HP250 components in the MFG/PRO software, qad has failed to identify that MFG/PRO is a derivative of HP250 in its copyright registrations. Even worse, for nearly three years, qad has prosecuted its copyright infringement suit against ALN asserting that MFG/PRO is a completely original work. This improper extension and overstatement of qad's copyrights is a misuse which this Court should remedy by declaring qad's copyrights unenforceable against ALN.

ALN identifies two allegedly improper actions by qad:

1. its failure to state on its copyright registrations the existence of MFG/PRO's derivation from HP250 and

2. its misuse of its rightful possession of a copyright to gain control over material for which it has no copyright.

That first action—though unlawful—might not by itself constitute a misuse.[14] It is rather the second action—the copyright misuse—that informs ALN's affirmative defense here. That defense, which has its historical roots in the equitable defense of unclean hands,[15] is a complete bar to qad's prosecution of its copyright infringement case against ALN.

No party can use the limited grant that a copyright confers to gain control of components over which it has no such right. For example, it is well established in patent cases that a patentee cannot extend the lawful monopoly in the properly patented item to control another item that is not a part of the patent (*Mercoid Corp. v. Mid–Continent Investment Co.*, 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376 (1944)). *Mercoid's* analysis also applies in copyright cases, as *F.E.L. Publications, Inc. v. Catholic Bishop of Chicago*, 214 U.S.P.Q. 409, 413 n. 9 (7th Cir.1982) (citing *Mercoid*) teaches:

[I]t is copyright misuse to exact a fee for the use of a musical work which is already in the public domain.

When a copyright holder attempts to use legal proceedings to protect an improper extension of a copyright, the court may refuse to enforce the copyright. That equitable principle was stated in the patent context by *Morton Salt Co. v. G.S. Suppi-*

---

swer ¶¶ 58 and 59 allege antitrust and unfair competition claims under the rubric of copyright misuse. While it is true that if ALN's defense were framed as an antitrust violation this Court would have to apply antitrust analysis (see, e.g., *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1200 (7th Cir. 1991)), a copyright misuse defense can be framed in other terms. As *Lasercomb*, 911 F.2d at 978 points out:

The question is not whether the copyright is being used in a manner violative of antitrust law (such as whether the licensing agreement is "reasonable"), but whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright.

This opinion focuses entirely on Answer ¶ 56 as a copyright misuse defense. It does not address the other allegations of unclean hands or antitrust violations.

**14.** This opinion need not resolve that question, because qad went beyond merely faulty registration by misusing the resulting copyright in the prosecution of this lawsuit. Having said that, however, this Court is constrained to observe that qad's actions before the Copyright Office were highly suspect. It is clear that qad knew that MFG/PRO was at least in part derived from HP250 (P.Mem. 1 states that its lawyer Edward Langs ("Langs") told the Copyright Office that MFG/PRO was based in part on

HP250). qad's explanation of why it nevertheless described MFG/PRO as an original work (without qualifying that description) in its copyright applications leaves a good deal to be desired. But once again it is not the validity of the ultimately-obtained copyright that is in question here. It is the manner in which it was used. Thus qad's suggestion (P.Mem. 9) that its actions before the Copyright Office did not constitute "bad faith" is simply not relevant.

**15.** *United States Gypsum Co. v. National Gypsum Co.*, 352 U.S. 457, 465, 77 S.Ct. 490, 494, 1 L.Ed.2d 465 (1957). As n. 13 indicates, ALN pleaded both the defenses of unclean hands (as such) and the related (though not identical) doctrine of copyright misuse, but only the latter is ruled on here. Inexplicably, qad's Mem. 7–9 concentrates exclusively on the unclean hands defense and therefore discusses its and ALN's actions before the Copyright Office, without any reference to how qad led this Court down the garden path. Not only is qad's argument off the point, but even on qad's own terms the result would be the same. If indeed both parties were possessed of unclean hands, qad (under in pari delicto principles) would then be prevented from seeking redress in this Court (see *Byron v. Clay*, 867 F.2d 1049, 1052 (7th Cir.1989)). That would compel the dissolution of its wrongfully-obtained preliminary injunction in any event.

*ger Co.,* 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363 (1942) (citations omitted):

It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest.

*Morton Salt, id.* at 494, 62 S.Ct. at 406 (citations omitted) went on to explain:

It is the adverse effect upon the public interest of a successful infringement suit, in conjunction with the patentee's course of conduct, which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent. Similarly equity will deny relief for infringement of a trademark where the plaintiff is misrepresenting to the public the nature of his product either by the trademark itself or by his label; see also, for application of the like doctrine in the case of copyright [citing cases]. The patentee, like these other holders of an exclusive privilege granted in the furtherance of a public policy, may not claim protection of his grant by the courts where it is being used to subvert that policy.

As *Morton Salt* indicates, that doctrine of misuse has been applied in copyright infringement cases as well (see *F.E.L. Publications,* at 413 n. 9). Thus *Lasercomb,* 911 F.2d at 976 (citations omitted) has held:

We are of the view, however, that since copyright and patent law serve parallel public interests, a "misuse" defense should apply to infringement actions brought to vindicate either right. As discussed above, the similarity of the policies underlying patent and copyright is great and historically has been consistently recognized. Both patent law and copyright law seek to increase the store of human knowledge and arts by rewarding inventors and authors with the exclu-

sive rights to their works for a limited time. At the same time, the granted monopoly power does not extend to property not covered by the patent or copyright.

In *Lasercomb, id.* at 978 the copyright misuse was the plaintiff's extension of its lawful copyright to control uncopyrighted material through the use of licensing agreements. In fact, the defendant there prevailed even though it was not a party to the improper agreements.[16]

### qad's Copyright Misuse

■ Here qad's misuse was even more egregious: It used its copyright to sue ALN and to restrain it from the use of material over which qad itself had no rights. That is a misuse of both the judicial process and the copyright laws. qad sought and received an injunction, the result of which severely restrained ALN. qad's deception has misled this Court into imposing unwarranted harm on ALN—and with the truth now having emerged, it is time to correct that grievous wrong.

At the core of qad's copyright misuse is its use of material in MFG/PRO that is not only not qad's original work but work that was actually copied from HP250.[17] Even worse, it was mostly that copied material that formed the focus of qad's case against ALN for copyright infringement at the early stages of this litigation, when qad sought and received injunctive relief against ALN. At the Hearing qad vehemently asserted:

1. that all of MFG/PRO was qad's original work and

2. that ALN must have copied qad's original work because ALN's MFG + was so similar to MFG/PRO.

Some examples of qad's presentation in support of both those contentions at the Hearing are illustrative.

**16.** *Lasercomb, id.* at 979 (relying on *Morton Salt*) holds that the defendant need not be directly injured by the original copyright misuse by being a party to the overreaching licensing agreement:

The question is whether Lasercomb is using its copyright in a manner contrary to public policy, which question we have answered in the affirmative.

**17.** It is unclear just where the dividing line lies between the protected and unprotected elements of MFG/PRO. To qad's discredit, it has obscured that line and further used that confusion to wield the heavy sword of litigation under the guise of legitimate copyright enforcement in areas in which it had no rights.

As to MFG/PRO's claimed originality, Pam Lopker testified (Tr. 24) that MFG/PRO was "original work" and that qad had written "every line of code from scratch." On cross examination, counsel for ALN asked Lopker about the genesis of MFG/PRO (Tr. 47–48):

Q. Well, I was talking about MFG/PRO. And you did in fact modify some of the Hewlett–Packard programs that you put into MFG/PRO?

A. No, that's incorrect.

Q. Then why are they new?

A. When we started with MFG/PRO we started with everything new. We started with new database design. If you look at our database on MFG/PRO it is nowhere similar to the database and final concepts that we used on the 250.
. . . .

On the subject of ALN's alleged copying of MFG/PRO, expert witness Rubenstein testified that he had examined MFG/PRO and MFG + and had found them to be similar. His conclusion was based substantially on his finding a number of files or procedures that had the same or similar names in the two programs (Tr. 230). Rubenstein's testimony emphasized the names of a particular set of files that had names beginning with the prefix "cm___" (Tr. 237), as to which he said in part (Tr. 303):

A. I've never seen cm underscore something. I—I think it's true that in some measure, yes, fields can be named the same. I mean, name, address, everyone calls it that.

Q. Right?

A. But to preface these field names with the character cm underscore, I think it pretty chancy that two people would just independently come up with that.

     *     *     *     *     *     *

A. And I think the chance of that just happening independently is vanishingly small.

On recross examination Rubenstein again emphasized that it was the "cm underscore" that was so unique that for ALN's program to have used it must mean that ALN had copied it from qad's MFG/PRO (Tr. 305–06). It was in great part

that striking similarity of file and program names in MFG/PRO and MFG + that led Rubenstein to the conclusion that ALN had indeed copied MFG/PRO (and that misled this Court to the point of granting a preliminary injunction). Rubenstein's central message to this Court was that although the two programs were "somewhat different stylistically, however, [ALN's version] did use the same basic structure; it did use the same file names, PROGRESS file names" (Tr. 652).

Rubenstein's testimony was emphasized by qad's counsel Langs, who in his closing arguments at the Hearing stated (Tr. 722–23):

So what we have here is a program that was designed by qad that was copied by ALN.... And there have been a lot of cosmetic changes, but you may rewrite all the programs, but they all had to fit in. And that's why the name files and the field files are so important, when the expert witness looks at code and finds up to 50% of the names in certain programs.

qad was so insistent that the Rubenstein-identified evidence proved widespread copying that it strongly urged this Court to issue a broad injunction against ALN's use of any of its MFG + programs. Langs cited *SAS Institute, Inc. v. S & H Computer Systems, Inc.*, 605 F.Supp. 816, 831 (M.D.Tenn.1985), for the proposition that this Court need not:

separate the "poison" of copying from the "soup" of the S & H product, the entire product should be enjoined.

and went on to state (Tr. 806):

I like the analogy of the [SAS] case, the poison in the soup, whatever, they have taken and fully profited wrongfully.

To a great extent this Court granted qad's requested relief against ALN by issuing the Order. But now the truth has emerged from the fog that qad deliberately created: Much of MFG/PRO is not original, and much of that unoriginal material—those portions copied from HP250 by qad—comprises many of the same field and program names that were allegedly copied by ALN.

In that respect the extent of copying attested to by ALN's expert Richard Sus-

lick ("Suslick") goes beyond the copying of similar names in fields and programs to the copying of instructions (see Suslick Supp. Decl. ¶ 10, at 11). qad has sought to respond by offering evidence to show that HP250 and MFG/PRO are different in many ways. But qad wholly fails to refute ALN's evidence that qad copied from HP250 in much the same way that it alleges ALN copied from MFG/PRO. While the evidence here does not show conclusively that qad violated the copyright on HP250 (an issue not now ripe for decision), it does show beyond dispute that qad used the copied material to induce this Court to grant it an injunction and thus misused its copyright.

qad also attempts to challenge both the experience and methods of Suslick by suggesting that he made errors in his examination (P.Mem. 11–18). ALN responds by filing a detailed refutation via the Suslick Supp.Decl. On this Rule 56 motion, of course, it would be inappropriate for this Court to weigh conflicting evidence. But no such procedure is required here: It is clear enough that those portions of HP250 that can be found in qad's MFG/PRO are the same kinds of elements—if not exactly the same elements—that qad accuses ALN of copying from MFG/PRO. qad can hardly say that the demonstrated amount of copying does not rise to the level of proving ALN's affirmative defense, when qad used the same type of evidence against ALN to induce this Court to grant qad injunctive relief. This point is discussed further below.

qad also states without factual support (P.Mem. 11) that Suslick "has no experience in manufacturing system software design." In fact, Suslick does have such experience (Suslick Supp.Decl. ¶¶ 2–3). qad also fails to mention that its own expert Rubenstein, whose testimony was used to persuade this Court to grant the injunction Order, himself had "no experience in the manufacturing area" (Tr. 287). Furthermore, the statement of qad's other expert Gary Alexander ("Alexander") upon which

qad's assertion is based (Alexander Decl. ¶¶ 4–6) shows that he concurs with Suslick's findings that the programs are similar.

One example of qad's inconsistency is especially striking: recall the "cm underscore" that Rubenstein found to be so unique.[18] On that score ALN's expert Suslick reports (Suslick Supp.Decl. ¶ 14):

> Mr. Lake instructed me to search for any occurrence of "cm__" in the HP250 system. I found hundreds of occurrences in field names and file names that use this prefix.

Without evincing so much as a blush, qad has now responded in a manner that both contradicts its earlier position at the Hearing and also further exposes its misuse of its copyright: It now asserts that all of the material that it copied from HP250 (much of which was also allegedly copied by ALN) is common to many manufacturing databases and is therefore functionally necessary. For example, P.Mem. 17 states (citations omitted):

> Suslick also suggests that use of the letters "ar", "ap", "gl", and "mf" (obvious abbreviations for "accounts receivable," "accounts payable," "general ledger" and "manufacturing") are indications that program names were copied. Here again, however, using common terms for common subject matter is not copying. Other companies use these same abbreviations.
>
> These similarities are no surprise. What is surprising is that Suslick cites them as examples of similarities in "software design." These items have nothing to do with the design of software.

On the same subject, Pam Lopker now states (Lopker Decl. ¶ 12, at 6):

> The fact that MFG/Pro and the HP250 software have some slight overlap in field names demonstrates merely that the two programs are targeted at the same general market.

qad's new "expert" Alexander says that the similarities between the two programs exist because (Alexander Decl. ¶ 5):

> Each of these functions is a necessary part of any quality manufacturing sys-

---

18. Even for the English purist, it does no real violence to the language to equate Rubenstein's

"vanishingly small" chance of an independent occurrence with the concept of uniqueness.

tem software and would be common to virtually all such systems.

Again referring to the common field and program names, Alexander says (*id.* ¶ 13):

> It is not uncommon for a system such as MFG/Pro to use these abbreviations in its program names to designate which functions the programs perform. The use of these names suggest [sic] nothing about whether MFG/Pro was derived from the HP250 software. Moreover, neither the copyright notices, the modification logs nor the file name abbreviations have any bearing on software design.[19]

■ qad's effort at a 180° turnabout in its new argument is perhaps the worst possible example of a plaintiff "mending his hold" in the midst of litigation. *Harbor Insurance Co. v. Continental Bank Corp.*, 922 F.2d 357, 362–64 (7th Cir.1990) teaches that a party cannot change its litigation position—that is, "mend the hold"—once it has committed to one.[20] Equitable principles—the source of that doctrine—call on this Court to respond to qad's new argument by not allowing it to change its position on the source of the field and program names in question.[21]

But even if that equitable doctrine had not called for qad's defeat here, the outcome on the current motion would be the same. Suppose qad were taken at its word (its present word)—suppose that it took those field and program names (as well as other parts of MFG/PRO that resemble HP250) from some generic source, or that it was necessary for qad to use them because of the functioning of the program—not the expression. Even on that assumption, qad still used elements over which it had no copyright as an essential vehicle for strong-arming ALN in this lawsuit. Either way qad has misused its copyright, and this Court will not lend aid to qad's infringement case against ALN.

### Conclusion

qad began to misuse its copyright over MFG/PRO when it attempted to extend its rights over material over which it had no copyright: those portions of its software that it copied from HP250. Yet it did not reveal that fact to its adversary or to this Court. Using its weapon of falsehood, qad pursued ALN in this Court—something that it could not have done without the advantage of its copyright.

That copyright misuse extended qad's copyright privilege beyond the scope of the grant and violated the very purpose of a copyright, which is to give incentive for authors to produce. After all, the creation of original writings is inhibited—not promoted—when a possessor of a copyright commits the kind of misuse evident here. This Court should not and will not offer its aid to a copyright holder whose actions run contrary to the purpose of the copyright itself.

Furthermore, qad's present arguments reveal that its presentation at the Hearing

---

**19.** [Footnote by this Court] In his closing argument at the Hearing, Langs emphasized the testimony of Rubenstein not only as to the similarity of field and program names but also as to certain "phantom" copyright notices (Tr. 724–25). Once again qad now reverses its position by stating that "copyright notices ... have [no] bearing on software design" (Alexander Decl. ¶ 13).

**20.** This is not a case in which a later litigation strategy differs from the original complaint due to information found in discovery (*id.* at 364). Here qad argued one position at an injunction proceeding, but now that the tables have turned it attempts to take the opposite position in an effort to protect itself. It *knew* the true facts when it first took its position that the field names were unique and not generic. It cannot perform a back flip on the identical issue now.

**21.** It would be impermissibly inequitable for this Court to allow a plaintiff to assert certain facts to win an injunction and then assert the opposite of those "facts" to fend off an affirmative defense. Some caveats are in order for the future, though:

> 1. This Court's denial of qad's attempt to mend its hold does not necessarily extend to qad's possible further defense against ALN's claims, for in that case the balance of equities may warrant a different result.
> 2. This opinion does not rule on the validity of the HP250 copyright. Although this Court has held that qad copied from HP250, it makes no ruling as to the source—original or otherwise—of the HP250 materials.

was grounded in knowing falsehood. More than a century and a half ago *Pidding v. How*, 8 Simons 477, 480 (V.C.1837)[22] stated:

> It is a clear rule, laid down by courts of equity, not to extend their protection to persons whose case is not founded in truth.

And this Court will not extend its protection to qad here. Accordingly, because there is no genuine issue of material fact as to ALN's affirmative defense to qad's Count III, it is entitled to a judgment as a matter of law on that count.

It necessarily follows from the analysis in this opinion that ALN was "wrongfully enjoined or restrained" (Rule 65(c)) by the Order. This Court consequently vacates the Order—and at the next status hearing the parties should be prepared to discuss the remedy to be accorded to ALN by reason of the improvident granting of preliminary injunctive relief against it.

Finally, it is again noted that this opinion involves no findings as to:

1. the validity of qad's copyright covering MFG/PRO,[23] or

2. whether qad committed fraud before the Copyright Office, or

3. whether the HP250 copyright is valid, or

4. which parts of MFG/PRO are original and which are copied.[24]

This action is set for a status hearing at 8:45 a.m. July 11, 1991 to discuss further proceedings in the case in light of this opinion.

## ORDER

This Court's July 3, 1991 memorandum opinion and order inadvertently contained two potentially misleading references to Richard Rubenstein ("Rubenstein")—once as "ALN's expert witness" (Opinion at 14) and later as "its [qad's] own expert" (Opinion at 17). In fact Rubenstein had originally been jointly engaged by the parties in his capacity as an independent expert appointed by this Court to examine and analyze the computer software at issue. Although he did not continue in that status of a joint engagement, he was called by qad to testify at the preliminary injunction Hearing. Both sides have agreed that the Opinion should be corrected, and accordingly (1) the word "ALN's" is deleted from the quoted phrase at page 14 [Editor's Note: Correction made in text] and (2) the words "its own" in the quoted phrase at page 17 should be understood as referring to qad's having called Rubenstein as its witness.

---

**22.** That identical approach was taken in the copyright case of *Stone & M'Carrick, Inc. v. Dugan Piano Co.*, 220 F. 837, 841 (5th Cir.1915) and was there used to support a fraud-on-the-public theory. If such a generalized fraud were all that were involved here, it might not have served as a defense for ALN (see *Mitchell Brothers Film Group v. Cinema Adult Theater*, 604 F.2d 852, 864 n. 25 (5th Cir.1979)). But in this instance qad directly misused its copyright in the prosecution of *this* case, a misuse that violates the purpose of the copyright itself. That combination of factors fits the copyright misuse doctrine to a T (*id.*).

**23.** It may be possible for qad to purge itself of the copyright misuse and then defend its copyright in another cause of action (see *Lasercomb*, 911 F.2d at 979 n. 22). But it is too late for qad to purge itself within the context of this lawsuit against ALN.

**24.** If a finding in that regard were necessary (as it is not), it would have been rendered impossible on the present record due to qad's muddying of the waters. In this case the line between qad's rightfully copyrighted material and other works has been clouded not by ALN's actions but by qad's copyright misuse.